*Not For Publication

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

The Honorable Freda L. Wolfson, U.S.D.J.

|  |  |
|---|---|
| LOTTOTRON, INC., | Civil Action No. 05-4562 |
| Plaintiff, | **OPINION** |
| vs. |  |
| GTECH CORP., |  |
| Defendant. |  |

For Plaintiff:
Joseph F. Posillico
Synnestvedt & Lechner LLP
1101 Market Street, Suite 2600
Philadelphia, Pennsylvania 19107

For Defendant:
Liza M. Walsh
Connell Foley LLP
85 Livingston Avenue
Roseland, New Jersey 07068

Wolfson, District Judge:

This patent litigation involves an allegation of infringement of Plaintiff Lottotron, Inc.'s ("Lottotron") U.S. Patent No. 5,921,865 (the "'865 patent"), entitled Computerized Lottery Wagering System, by Defendant GTech Corp.'s ("Gtech") E-Scratch electronic gaming product. In this matter, the parties request the Court to construe the following terms in dispute within the claims of the '865 patent: 1) enter a wager; 2) prospective wagerer; 3) identification information/identification; and 4) wagering format.[1] A Markman hearing was not held by the Court as the claims at issue are not extremely technical.[2] The Court shall construe the terms in the context of the asserted claims as follows.

I.    Overview of the '865 Patent

This patent concerns a lottery wagering system or method that enables a subscriber to place lottery wagers through a telecommunication means, such as a telephone, in one or more available lotteries. Specifically, the '865 patent is the last in a series of five patents that describe and claim a computerized lottery wagering system. The system permits an individual to place a lottery wager remotely using a telephone or other telecommunication device. In particular, an individual accesses the system remotely to enroll with the system by setting up an account and establishing a credit balance for wagering, then selects a lottery game to play, and finally places a

---

[1] The parties dispute the meaning of only four claim limitations. Gtech proposed definitions of additional claim terms. To the extent those definitions differ from the definitions proposed by Lottotron, Lottotron agrees to use Gtech's definitions of those claim limitations. Apart from the four specific terms currently in dispute, Lottotron does not dispute the remainder of the other definitions proposed by Gtech.

[2] "Nothing mandates the use of a Markman hearing in every patent case. Courts retain the discretion to construe the claims on the basis of a paper record alone. In a case such as the present one, where the technology is accessible to the court and the claims are relatively straightforward, a Markman hearing is unnecessary." Aspex Eyewear, Inc. v. E'Lite Optik, Inc., No. 98-2996, 2002 WL 1751381, at *11 n.6 (N.D. Tex. Apr. 4, 2002)(citations omitted).

lottery wager for the selected game using the balance.

## II.     General Legal Claim Construction Standards

Claims define the scope of the inventor's right to exclude. Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005). Claim construction is to determine the correct claim scope, a determination exclusively for the Court as a matter of law. Markman v. Westview Instruments, Inc., 52 F.3d 967, 978-79 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). Indeed, the Court can only interpret claims, and "can neither broaden nor narrow claims to give the patentee something different than what it has set forth" in the specification. E.I. Du Pont de Nemours v. Phillips Petroleum Co., 849 F.2d 1430, 1433 (Fed. Cir. 1988).

This interpretive analysis begins with the language of the claims, which is to be read and understood as it would be by a person of ordinary skill in the art. Dow Chem. Co. v. Sumitomo Chem. Co., 257 F.3d 1364, 1372 (Fed. Cir. 2001); see also Markman, 52 F.3d at 986 ("The focus [in construing disputed terms in claim language] is on the objective test of what one of ordinary skill in the art at the time of invention would have understood the terms to mean"); see also Phillips, 415 F.3d at 1312-13. In construing the claims, the Court may examine both intrinsic evidence (e.g., the patent, its claims, the specification and prosecution history) and extrinsic evidence (e.g., expert reports, testimony and anything else). Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999). However, claims may not be construed with reference to the accused device, which means that the Court may not construe a claim to fit the dimensions of the accused device, thus to prejudice the claim construction by "excluding or including specific features of the accused device." Wilson Sporting Goods Co. v. Hillerich & Bradsby Co., 442 F.3d 1322, 1330 (Fed. Cir. 2006). However, the knowledge of the accused device before or during claim construction is not only permissible, but also necessary to claim

construction because it "supplies the parameters and scope of the infringement analysis." Id. at 1330-31; Lava Trading Inc. v. Sonic Trading Mgmt., 445 F.3d 1348, 1350 (Fed. Cir. 2006).

In interpreting the disputed terms, it is well settled that the Court should look first to the intrinsic evidence. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1356, 1362 (Fed. Cir. 1996). Generally, words in patent claims are given their ordinary meaning as understood by one of ordinary skill in the art at the priority date of the patent application. Dow Chem., 257 F.3d at 1372; K-2 Corp. v. Salomon S.A., 191 F.3d 1356, 1362 (Fed. Cir. 1999). The claims must be construed objectively in the context of both the particular claim and the entire patent because "the claims themselves provide substantial guidance as to the meaning of particular claim terms," and claim terms are normally used consistently throughout the patent. Phillips, 415 F.3d at 1313-14.[3]

Moreover, courts are instructed to look to the specification, which is a written description of the invention. "[C]laims 'must be read in view of the specification, of which they are a part.'" Phillips, 415 F.3d at 1315 (quoting Markman, 52 F.3d at 979). Indeed, specification is perhaps "the single best guide to the meaning of a claim term" due to its statutory requirements of being in "full, clear, concise, and exact terms." Phillips, 415 F.3d at 1316; see 35 U.S.C.§112. "The specification acts as a dictionary when it expressly" or implicitly defines terms used in the claims. Markman, 52 F.3d at 979. Thus, it effectively limits the scope of the claim. On demand Mach. Corp. V. Ingram Industries, Inc., 442 F.3d.1331, 1340 (Fed. Cir. 2006). Due to its nature, "the specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive. . . .'" Id. (quoting Vitronics Corp., 90 F.3d at 1582).

---

[3]Gtech argues that the Court should consider the operation of the accused device, the E-Scratch electronic gaming product, because it provides context for this matter. However, as the Court shall discuss below, while the Court takes notice of the accused device, the intrinsic evidence of the patent at issue is sufficient for the Court to construe the disputed terms. As such, no references to the accused device is necessary nor is it permissible.

Extrinsic evidence includes all evidence external to the patent and prosecution history, i.e., expert and inventor testimonies, dictionaries, and learned treatises. Markman, 52 F.3d at 980. It is considered only where the intrinsic evidence does not provide a sufficient description to resolve ambiguities in the scope of the claim.  See Vitronics, 90 F.3d at 1583; Johnson Worldwide Associations v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999).  However, the Federal Circuit cautioned, in Phillips, that dictionary definitions should not be used to interpret patent claim terms in a manner that is divorced from the context and description of the invention in the specification.  Phillips, 415 F.3d at 1321.  The Phillips Court reasoned that because of the nature of the patent claims, the dictionary definitions, as extrinsic evidence, are usually less reliable than the patent documents themselves in establishing the ordinary meaning of a claim term. Phillips, 415 F.3d at 1314; Toro Co. v. White Consol. Indus., 199 F.3d 1295, 1299 (Fed. Cir. 1999).  Ultimately, extrinsic evidence cannot be used to vary or contradict claim terms when their meanings are discernible from intrinsic evidence. C.R. Bird, Inc. v. U.S. Surgical Corp., 388 F.3d 858, 862 (Fed. Cir. 2004).

**III. Discussion**

    **A.  Wager**

The parties dispute the definition of the term "wager" in the context of the patent claims. Specifically, the last step of the "method for automatically accepting a plurality of different wagering formats over a computer system" in every one of the asserted claims of the '865 patent is "requesting said prospective wagerers to enter a wager."  Based on that context, Lottotron claims that "wager" is commonly understood to place at risk an infinite variety of things apart from money; such as, pride, bragging rights, avoidance of embarrassment, etc.  Lottotron further claims that the breadth

of the term is confirmed by its dictionary definition.[4]  On the other hand, Gtech submits that pursuant to the intrinsic evidence, "wager" is only limited to denote risking a sum of money.

It is readily apparent from gleaning the '865 patent that "wager" involves risking money.  In fact, throughout the patent, references to money are indicated.  There is a lack of description in the patent to demonstrate that "wager" places at risk pride, bragging rights, avoidance of embarrassment, and <u>etc.</u>  Indeed, other than a definition from a dictionary, Lottotron has failed to identify any intrinsic evidence to show that "wager" involves more than just a sum of money.  Accordingly, the Court concurs with Gtech and construes the word "wager" to mean risking a sum of money.

To find support from the intrinsic evidence, the Court first reviewed the "Background of the Invention" section, which makes clear by comparison that the invention involves wagering money:

> None of the aforementioned systems allow a subscriber to call up on a touch-tone telephone, set up an account with a lottery system, place wagers in one or more lotteries available on the system, and charge the account for the wager.

'865 patent, col. 1, ll. 64-67.  Next, in the "Summary of the Invention" section, the invention apparently requests "subscriber wagering information," including "a wagering amount for the particular lottery game chosen."  <u>Id.</u>, col. 2, ll. 24-31.  Moreover, with respect to the description of the figures drawn in the patent, references to dollar amount are readily found.

> If the caller confirms the date by pressing 1 then the VRU will respond with the message "Enter your two-digit weekly wager amount", else the VRU will again request the expiration month and year.  When the caller then enters "10" signifying that on a weekly basis they wager ten dollars ($10.00) on lottery games, the VRU confirms the weekly wager amount by responding with a message "You have entered 10 dollars, press 1 to confirm, 2 to re-enter".  In our examples, since the caller pressed '1' to confirm, the VRU then plays the message, "The system will now charge your credit card with 50 dollars, providing you with an open balance to wager."

---

[4] Lottotron cites to the American Heritage Dictionary, which defines "wager" as "something staked on an uncertain outcome."  <u>The American Heritage Dictionary</u>, Second College Edition (1991) at 1359.

Id., col. 4, l. 65 - col. 5, l. 9.  The patent then describes how the invention prompts the user to enter a wagering amount that will be withdrawn from the credit balance.

> The VRU then request the entry of the amount to be wagered during this call.  The host compares this amount to the subscriber's open balance to wager to insure that sufficient funds are available for wagering.  The system only reduces the open balance to wager as wagers are placed and not by the entry of this wager amount.  The VRU plays the message, "Enter 2-digit wager amount".  In our example, the subscriber entered '10', and the VRU then responds with, "you entered 10 dollars, press 1 to confirm, 2 to re-enter".  As shown the subscriber responded by pressing '1'.

Id., col. 6, ll. 22-32.  Ultimately, the system determines whether the user has "sufficient funds to place a wager" by "compar[ing] the subscriber's open balance to wager against the amount which they indicated they would be wagering."  Id., col. 7, ll. 19-21.

Clearly, as indicated by the patent language itself, the type of wager contemplated by the specification is monetary in nature, particularly since all the embodiments of the '865 patent require that the user provide information of a credit card from which the system can withdraw money in order to place wagers.  See, e.g., id., col.2, ll. 12-18; col.4, ll. 36 - col. 5, l. 45; col.8, ll. 34-39; col.10, l. 45 - col. 11, l.45.  Thus, as the meaning of "wager" is apparent from the specification, it is improper for the Court to employ the dictionary meaning as proposed by Lottotron. See C.R. Bird, Inc., 388 F.3d at 862.  Indeed, accepting Lottotron's proposed definition would clearly depart from "the true scope and spirit of the invention." '865 patent, col. 11, ll. 60-61.  As such, the Court will construe the term "wager" to mean risking a sum of money.

    **B.**    **Prospective Wagerer**

Both parties agree that the term "subscriber" in the claims means "one who wishes to enroll or wager with the system."  See Gtech's Sur-reply Claim Construction Brief at p. 2.  However, with respect to the term "prospective wagerer," Lottotron submits that, pursuant to the context of the '865 patent, "prospective wagerer" should be construed to mean the same as a "subscriber."  On the other

hand, Gtech contends that "prospective wagerers" are a subset of the category of the individuals who are "subscribers." Particularly, "prospective wagerer" is a subscriber who then goes on to access the system to enter one or more wagers. Based upon the intrinsic evidence, the Court adopts Gtech's definition of this term.

Lottotron submits that based upon the language of claims, "prospective wagerer" is used interchangeably with "subscriber" without any distinction. For example, Lottotron cites to claim 8 of the '865 patent, which reads in relevant part, "receiving incoming communications from prospective wagerers and routing each of said communications according to which one of said plurality of different wagering formats is requested by a subscriber." '865 patent, col. 12, ll. 38-41. Lottotron contends that the if the two terms were to have different meanings, it would render the claim language illogical because "subscriber" and "prospective wagerer" would be two different users both accessing the system at the same time. The Court finds this argument unpersuasive and insufficient to demonstrate the meaning of the term. Under Gtech's proposed definition, a "prospective wagerer" is simply a subset of "subscriber." Therefore, it is consistent for a "subscriber" user, who has enrolled with the system, to call in to make a wager. The Court finds that the ordinary meaning of the term "prospective wagerer" controlling.

The term "prospective wagerer" is not used in the specification, but its ordinary meaning is consistent with the specification's use of the synonymous phrase "subscribers who wish to wager with the system" described in the specification. For instance, in the "Summary of Invention" section, the patentee specifically references "subscribers who wish to enroll with the system, and for receiving incoming wagering calls from subscribers who wish to wager with the system." '865 patent, col. 2, ll. 5-9. This statement specifically differentiates between users that "wish to enroll" and users that "wish to wager." Although both parties agree that "subscribers" are users that wish

to enroll and wager with the system," the Court finds that to afford "prospective wagerer" the same meaning as "subscribers" would render this statement meaningless. More importantly, without explicitly defining the "prospective wagerer" in the specification, the Court is to accord the plain and ordinary meaning of the term "prospective wagerer"; simply put, a subscriber who has enrolled [not who simply wishes to enroll] and "wish[es] to wager with the system." Accordingly, based on the foregoing reasons, the Court construes the term "prospective wagerer" to mean " a subscriber who then goes on to access the system to enter one or more wagers."

### C.  Identification Information and Identification

The terms identification information and identification appear in claims 8-12, 18-20 and 24 to 26 of the '865 patent. Claims 8-12 and 18-10 recite the step of "requesting identification information from said prospective wagerers," while claims 24 to 26 recite the step of "requesting identification from said prospective wagerers." Gtech proposes that the term identification information means that it is "information that identifies a prospective wagerer, including an account number and a personal identification number." To the contrary, Lottotron submits that identification information should encompass a much broader definition, and thus, should mean "identification information, such as an identification number." Pursuant to the intrinsic evidence, the Court shall adopt Gtech's definition.

The Court finds substantial support from the "Summary of the Invention" section. It states that "the invention provides a lottery wagering system comprising . . . second voice responsive means (wagering VRU) . . . requesting subscriber wager information . . . including an account number, a personal account number, a personal identification number." Id., col. 2, ll. 2-28. The patent goes on to explain how the system requests identification number information, including an account number and personal identification number:

> As shown in FIG. 3 in the Subscriber Identification And Game Selection process, the VRU plays a welcome message to the subscriber and requests their account number as depicted in FIG. 3a. In our example, the subscriber entered '123456789098', and the VRU responded with, "You entered 123, 456, 789, 098, press 1 to confirm, 2 to re-enter". The subscriber responded with a 1 and the VRU then played the message, "Enter your personal ID". The subscriber entered '12345' and the VRU responded with "You entered 123, 45, press 1 to confirm, 2 to re-enter". The subscriber responded by pressing '1' to confirm that the number was correct. The VRU stores the subscriber ID and PIN and immediately sends a transaction to the host to validated the subscriber.

Id., col.6, ll. 5-18. As indicated from these excerpts, the patent language clearly references identification information to include an account number and personal identification number. Despite the apparent references in the patent language, Lottotron argues that there is nothing in the subject claims themselves which requires the creation of an account, and nothing that requires the generation of a personal identification number. However, Lottotron ignores that in substantially all of the embodiments of the system, it requests identification information, including an account number and a personal identification number. In fact, no other embodiment that does not require the user to provide an account number and personal identification number is even suggested in the patent. Accordingly, as claim construction begins and ends in all cases with the actual words of the claim, it is appropriate for the Court to define the terms to be limited in this respect, and construe the terms identification information and identification to mean "information that identifies a prospective wagerer, including an account number and a personal identification number." See Renishaw PLC v. Marposs Societa per azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998) (citations omitted).

      D.      **Wagering Format**

Lottotron proposes that "wagering format" means "the kind of lottery games that are available, such as Keno, Lotto, and 3- or 43- digit lotteries." Gtech, however, submits that construction of "wagering format" is a "wagering game in which the outcome of the game

determines the outcome of the associated wager." The Court fails to find support for Gtech's proposed definition from the intrinsic evidence. Rather, the intrinsic evidence properly supports Lottotron's construction.

Gtech's proposed definition of "wagering format" is apparently based upon the logic that for every lottery game, the player places a wager before the outcome of the game is determined, and the outcome of the game determines the outcome of the wager. Thus, the term, Gtech contends, necessarily includes not only the variety of lottery games available on the system but also the ultimate outcome of the wager. To support its reasoning, Gtech cites to certain language of the patent that identifies the different game formats available on the system (e.g., six digit lotto, three digit lotto, keno and four digit lotto), and how a user can access and play these lotto games. However, the language does not mention, let alone describe, the outcome of a player's wager or the game. Instead, the language seems to support Lottotron's definition of "wagering format."

For example, in the "Summary of invention" section, the patentee states that "the invention provides a lottery wagering system comprising . . . second voice responsive means (wager VRU) . . . requesting subscriber wager information . . . including . . . a particular lottery game format chosen from a plurality of lottery game formats available . . . and a wagering amount for the particular lottery game chosen." '865 patent, col. 2, ll. 2-31. The patentee goes on to state with respect to Figure 1 that the system "places a wager" for the caller based on information provided by the caller, including "the particular lottery format of interest, such as 6-Digit lotto, 'keno', 3-Digit lotto." Id., col. 3, ll. 22-30. Accordingly, pursuant to the intrinsic evidence, restricting "wagering format" to "a wagering game in which the outcome of the game determines the outcome of the associated wager" is plainly contrary to the ordinary meaning of the term "wagering format." Thus, the Court construes the term to mean the "kind of lottery games that are available, such as Keno,

Lotto, and 3- or 43- digit lotteries."[5]

---

[5]Indeed, as Lottotron points out, "wagering format" has been constructed, by the United States District Court for the Southern District of New York in Lottotron, Inc. v. Scientific Games Corp., No. 03-0920, 2003 U.S. Dist. LEXIS 15507 (S.D.N.Y. Sep. 9, 2003), as "the kind of lottery games that are available." Id. at *8 n.2.  Although Gtech argues that the district court did not analyze the term, and that it merely offered an explanation to provide context for the analysis of the construction for other terms, the district court certainly would not have based its claim constructions on an inappropriate meaning of another term.  Nonetheless, this Court finds such interpretation persuasive not only because of the New York court's correct analysis, but also because of this Court's independent construction of the term based upon the intrinsic evidence.

IV.     Conclusion

For the foregoing reasons set forth above, the following chart summarizes the Court's constructions of the disputed terms:

| Disputed Terms | Lottotron's Proposed Constructions | Gtech's Proposed Constructions | Court's Determinations |
|---|---|---|---|
| "Wager" | "Wager" involves a risk of an infinite variety of things apart from money i.e., pride, avoidance of embarrassment. | "Wager" involves a risk of a sum of money. | "Wager" involves a risk of a sum of money. |
| "Subscriber/ prospective wagerer" | Both terms are used interchangeably to mean "one who wishes to enroll or wager with the system." | "A subscriber who accesses the computer system to enter one or more wagers." | "Prospective wagerer" means "a subscriber who accesses the computer system to enter one or more wagers." |
| "Identification information/ identification | "Identification information, such as an identification number." | "Identification information" is information that identifies a prospective wagerer including an account number and a personal identification number. | "Identification information" is information that identifies a prospective wagerer including an account number and a personal identification number. |
| "Wagering format" | "The kind of lottery games that are available, such as Keno, Lotto, and 3- or 4- digit lotteries." | "A wagering game in which the outcome of the game determines the outcome of the associated wager." | "The kind of lottery games that are available, such as Keno, Lotto, and 3- or 4- digit lotteries." |

An appropriate Order shall follow.

Date: November 7, 2007                                              /s/Freda L. Wolfson
                                                                    Freda L. Wolfson, U.S.D.J.